J-A21030-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: L.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.M.D.L.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 453 WDA 2017 |

Appeal from the Order February 22, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-214-2016


BEFORE:   BENDER, P.J.E., OLSON, and STABILE, JJ.

MEMORANDUM BY OLSON, J.:                    FILED OCTOBER 20, 2017

M.M.D.L.R. ("Father") appeals from the order dated February 17, 2017, and entered on February 22, 2017, granting the petition filed by the Allegheny County Office of Children, Youth and Families ("OCYF" or the "Agency"), and involuntarily terminating his parental rights to his male child, L.M. ("Child") (born in January of 2014), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]

_____

[1] In the same order entered on February 22, 2017, the trial court terminated the parental rights of Child's mother, S.F., ("Mother"), after she withdrew her contest to the involuntary termination.  See Trial Court Opinion, 4/24/17, at 1 n.1; N.T., 2/10/17, at 4.  In the same order, the trial court also involuntarily terminated the parental rights of any unknown father to Child.  Neither Mother nor any unknown father has filed an appeal, nor is Mother or any unknown father a party to the present appeal.

On November 28, 2016, OCYF filed the petition to terminate Father's parental rights to Child. The trial court held a hearing on the petition on February 10, 2017. Attorney Lilian A. Akin, on behalf of OCYF, and Attorney Cynthia B. Moore, guardian ad litem ("GAL") for Child,[2] were present. Father and his counsel, Attorney Raymond N. Sanchas, and Mother's counsel, Attorney Rhonda A. Marks, were also present at the hearing. OCYF first presented the testimony, via telephone, of Terry O'Hara, Ph.D., the court-appointed psychologist from Allegheny Forensic Associates who conducted several evaluations of the family. N.T., 2/10/17, at 6. Attorney Sanchas cross-examined Dr. O'Hara, then Attorney Akin conducted re-direct examination, followed by re-cross examination by Attorney Sanchas. OCYF next presented the testimony of Hannah Shankle, the Family Service caseworker for Child's family. Id. at 45. Attorney Sanchas cross-examined Ms. Shankle, as did the GAL. Attorney Akin then conducted re-direct examination of Ms. Shankle.

Next, Father presented the testimony of Carles Kemp, a family support transportation worker for A Second Chance, Inc. Id. at 86. Mr. Kemp supervised the visits between Father and Child since July 2016. Id. at 86-88. Attorney Akin cross-examined Mr. Kemp. Father testified on his own

---

[2] Attorney Moore has filed with this Court an advocate's brief on behalf of Child.

behalf. Id. at 92. Attorney Akin questioned Father on cross-examination. Attorney Sanchas conducted further questioning of Father on re-direct examination. OCYF then presented the testimony of Ms. Shankle in rebuttal. Id. at 118.

The trial court found the following:

Hannah Shankle (hereinafter, "Ms. Shankle") was the Family Service caseworker for this family since April 14, 2015. Ms. Shankle testified that Child came to the attention of OCYF on November 9, 2014, after he presented at Children's Hospital of Pittsburgh with multiple injuries. See OCYF Exhibit 1; Stipulation No. 6 at 1. After an investigation, OCYF found a "large abrasion to [Child's] head, scratches to his nose in a symmetrical shape, a bruise to his right ear and behind the ear, a large four-centimeter linear abrasion over the left side of his head and a two-centimeter bruise to the right back area of his head." On November 10, 2014, OCYF obtained an Emergency Custody Authorization (hereinafter, "ECA") because "no clear explanation" for the injuries was provided to OCYF.

On February 4, 2015, Child was adjudicated dependent pursuant to [subsection one] of the Pennsylvania Juvenile Act at 42 [Pa.C.S.A.] § 6302. Mother and Father stipulated that Dr. Jennifer Wolford and Dr. Romberger, doctors from the Children's Advocacy Center (hereinafter, "CAC") of the Children's Hospital of Pittsburgh of UPMC, "would have testified that [Child] was brought to [the] hospital with bruises and scratches and unexplained injuries." See OCYF Exhibit 1, Stipulation No. 10, at 2.

OCYF created a Family Plan which listed the following goals for Father: 1) mental health; 2) parenting; 3) domestic violence; and 4) remain in contact and cooperate with OCYF.

OCYF created a mental health goal for Father because during the initial investigation he admitted that he had a history of depression and Post-Traumatic Stress Disorder (hereinafter, "PTSD") and was in treatment at the VA Hospital at that time. During the initial family conference on April 28, 2015, Ms.

Shankle observed a verbal altercation between Father and his sister where Father "became very angry, began cursing, yelling and screaming and eventually stormed out of the home, got in his vehicle and sped out of the driveway."

Domestic violence was a goal for Father because OCYF was active with Father and another child.[fn.1]   Additionally, OCYF received documentation from the Monroeville Police Department "of numerous calls to the home where [Father] and [Mother] resided regarding domestic disputes, and [OCYF] also had received information from [Mother] in June 2016 of domestic violence."

Ms. Shankle testified that Father had a goal of parenting because OCYF was made aware of two previous charges of endangering the welfare of a child in West Virginia and Colorado. "Additionally, [OCYF] had concerns due to the physical injuries that [Child] had sustained as well as injuries that [I.K.-M.], [Father's] other daughter, had sustained while in his care."

OCYF offered Father a multitude of services in order to reach his Family Plan goals.  On May 9, 2015, Father completed a parenting program at Arsenal.  In-home services through Family Resources were also available to Father.  To address his goal of domestic violence, Father participated in the Men's Group through the Women's Center and Shelter.  Father's mental health treatment included medication management through the VA Hospital as well as outpatient therapy which he completed through the Vet Center.  OCYF also provided Father with gas cards and a toddler bed to assist Father with his visitation with Child.

In terms of progress, Father has not met his goal of mental health.  Ms. Shankle provided examples of why OCYF believes this and explained that Father "has been consistently involved in outpatient therapy; however, his medication management through the Veterans Hospital has not been consistent."  Ms. Shankle testified that "OCYF confirmed that Father did not provide his therapist information as to why [Child] actually came into care and is not addressing this issue in therapy."  See OCYF Exhibit 3; Trial Court Order, 5/11/16, at 3.  Additionally, OCYF received information that Father had a third child who resided in the Colorado area.  On August 17, 2016, after a permanency review hearing, Ms. Shankle asked Father about his third child

and Father "stated that this was none of my business, that he would not discuss this with me, and he was very confrontational during that encounter." In December [] 2016, Ms. Shankle asked Father to sign releases of information and documents for Child to participate in Westmoreland Intermediate Unit, a regional education service for children. Ms. Shankle observed that Father was "very frustrated and combative" and "very resistant" to sign the releases of information. OCYF also believes Father did not meet his mental health goal because he was not compliant with his medication.

Father's visitation with Child has remained consistent and he completed a parenting program at Arsenal on May 9, 2015. See OCYF Exhibit 1; Stipulation No. 15 at 2. However, there has been a lack of progress in terms of his visitation with Child and Father's parenting ability. Father obtained unsupervised visitation on September 17, 2015. However, on September 22, 2015, KidsVoice filed a Motion for Supervised Visits.[fn.2] Visitation was ordered to go back to supervised on September 25, 2015. On May 11, 2016, Father was again given unsupervised visitation. Father reported that "the visits have gone well and have been successful." However, visits "went back to being supervised by court order on July 6, 2016 due to reports of [Child's] behavior declining since visits moved to unsupervised." See OCYF Exhibit 1; Stipulation No. 27 at 3.

> They have reported that [Child] is now extremely 'clingy' and 'needy.' ['][Child] does not interact well with other children in the daycare. He has been hitting and kicking children. [Child] has also appeared fearful of unknown adults. [Child] was observed covering his ears and appeared extremely startled when teachers prompted him to stop while redirecting him in the daycare.' Further, the foster family alleged that [Child] has been experiencing 'night terrors.' [Father] denied observing any of these behaviors during visits. OCYF questions 'if these behaviors are the result of the large transition, or if something possibly is occurring during the visits.' KidsVoice provided similar information with respect to alleged changes for [Child] since unsupervised, overnight visitation commenced. From KidsVoice['s] perspective, the changes reported by [Child's] foster parents, daycare, and early intervention clinician are 'drastic, as he reportedly [becomes] aggressive, 'needy, clingy, and

afraid to change classrooms unless he knows where he is going. [Child] does not like to leave the daycare unless he is picked up by his foster father or foster mother.' When a staff member from A Second Chance arrives to transport [Child], he 'screams and cries. On one occasion, [Child] held onto the curtains and screamed when the A Second Chance worker arrived to pick him up. He pulled on them so hard they came off.' In addition, [Child's] foster mother, according to KidsVoice, indicated that [Child] 'now touches and holds his private parts both inside and outside his diaper. It has been reported that [Child] covers his ears when reprimanded.' These behaviors are 'new,' according to KidsVoice. Also, KidsVoice reported that [Child's] behavior seems to return to normal as the week goes on, and gets worse again after Thursday visits. . . .

See OCYF Exhibit 2; Psychological Evaluation Report, 6/21/16, Collateral Information, at 2-3.

_____

[fn.1] Father had a history of domestic abuse with his previous wife, S.K. I.K.-M. is Father's daughter with S.K. I.K.-M. was also active with OCYF and a dependent child with the court.

[fn.2] This motion alleged that the caseworker reported that: Father drove carelessly; Foster Mother "observed a brush burn" on Child's back; Father was "not spending much time actually interacting" with Child; and Father's "mental health treatment is unverified." Motion for Supervised Visits; 9/22/15, at 1-3.

Trial Court Opinion, 4/24/17, at 3-6 (footnotes in original) (some internal footnotes, citations, and capitalization omitted).

On February 17, 2017, the trial court granted OCYF's petition and terminated Father's parental rights to Child. On March 23, 2017, Father filed the notice of appeal from the termination decree regarding Child, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of [Father's] parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b)?

Father's Brief at 5.[3]

In his first issue, Father argues that the evidence demonstrates that he made sufficient progress in compliance with the goals set by OCYF for him to be reunified with Child. Father's Brief at 9-10 and 16. Father complains that OCYF was unwilling to accept his explanation for Child's injuries as accidental, despite the fact that OCYF had no explanation for the cause of the injuries. Id. at 9-10. Specifically, Ms. Shankle testified that Father made progress in parenting, and admitted that there had not been any reported incidents of domestic violence since November of 2015. Id. at 9 (citing N.T., 2/10/17, at 66 and 74). Father also states that Dr. O'Hara acknowledged that Father had positive parenting skills. Father's Brief at 9 (citing N.T., 2/10/17, at 10).

_____

[3] We note that Father stated his issues somewhat differently in his concise statement, particularly, that he has reduced the number of issues by combining them. We, nevertheless, find them sufficiently preserved for our review.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. In re: R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. Id.; R.I.S., 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Id.; see also Samuel Bassett v. Kia Motors America, Inc., 34 A.3d 1, 51 (Pa. 2011); Christianson v. Ely, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. Id.
>
> As [the Pennsylvania Supreme Court] discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. R.J.T., 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994).

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue."

Id. (quoting In re J.L.C., 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). We will address section 2511(a)(2) and (b), which provide, in relevant part:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

[Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

In re Adoption of J.J., 515 A.2d 883, 891 (Pa. 1986) quoting In re: William L., 383 A.2d 1228, 1239 (Pa. 1978).

In re Adoption of S.P., 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. In re A.L.D. 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. Id. at 340.

The trial court addressed Father's issue challenging the sufficiency of the evidence to support the termination of his parental rights as follows.

> While Father has been relatively compliant with the Family Plan, Father has failed to make adequate progress and cannot or will not remedy the conditions that existed which led to the removal of Child in a reasonable amount of time. Additionally, termination meets the Child's needs and welfare. This [c]ourt finds it unsettling that Father's visitation was twice ordered to go back to being supervised and that Father has not been able to obtain unsupervised visitation again since July 6, 2016. Despite Father's completion of the Arsenal parenting program, Ms. Shankle testified that Father "lacks consistency" and "still had to ask basic questions about activities" for Child. For example, Father had to be reminded that Child needed to wear a helmet while riding a motorized four-wheeler. Father also continued to need to be "redirected about the cleanliness of his home and the environment that [Child] is sleeping in" after it was discovered that Child's bedroom did not have the toddler bed in it and there were car parts and papers on the floor.
>
> Ms. Shankle testified that while Father reached some of the goals set out for him in the Family Plan, OCYF sought termination of Father's rights because:
>
> > [Child] has been in care for 27 months. [OCYF] has provided [Father] with a number of services and support to reunify with [Child]. Unfortunately, [Father] has been unable to reach a point that reunification is possible. As [OCYF] has moved towards unsupervised visits on two

occasions, the visits had to revert back to being supervised.

On the second time that [Father] had unsupervised visitation and overnight visitation with [Child], [Child] had exhibited severe behaviors where he was having night terrors and having severe tantrums and emotional disturbances.

It is of paramount concern that Father has not provided an adequate explanation of the injuries to Child that brought him into care. This [c]ourt concluded that Father does not have the capacity to parent Child and cannot or will not remedy the conditions which led to removal in a reasonable amount of time. In reaching this decision, this [c]ourt relied upon the testimony of Terry O'Hara, Ph.D., [] a licensed psychologist for Allegheny Forensic Associates, who conducted several evaluations of this family throughout the history of this case. Dr. O'Hara had "significant concerns that the essential issues leading to [Child's] removal have not been addressed. . . . I think [Child] is still at risk for abuse and injury if he were to be unsupervised with his father." Dr. O'Hara explained that there's been "a multitude of unexplained injuries for [Child] which there's been no explanation for the injuries by his parents. . . . I have no evidence that these issues have been addressed."

On February 11, 2015, Dr. O'Hara conducted an interactional evaluation of Father, Child and Child's half-sibling, I.M.-K. Dr. O'Hara observed that Father demonstrated positive parenting skills, however, he noted that Father "was not appropriately supporting [Child's] head while carrying him, [Father] acknowledged 'dropping' [Child] during a relatively recent visit, and acknowledged that [Child] accidentally struck his head on the door frame while being carried by [Father]. [Father's] elbow also covered [Child's] mouth on one occasion for several moments during this evaluation." See OCYF Exhibit 2; Psychological Evaluation Report, 2/11/15, Discussion & Recommendations, at 21.

On March 10, 2015, Dr. O'Hara conducted an individual evaluation with Father. Dr. O'Hara noted several concerns with Father's mental health:

[Father] acknowledged carelessness and awkwardness with the children. . . . [Father] has been involved with the police on several occasions and he often externalized

- 12 -

responsibility for his circumstances with police involvement, negative interactions with the Army, and his interactions with OCYF. During the evaluation, [Father] acknowledged depressed mood, inattention, over activity, impulsivity, a history of anxiety, several symptoms of PTSD, and a history of anger management concerns. He also acknowledged domestic violence in his relationship with [S.K.], and he alleged exposure to domestic violence and abuse during his upbringing. He has not been consistent with treatment through the VA. In this examiner's opinion, [Father's] carelessness with the children is, at least in part, related to his unaddressed mental health concerns, including PTSD and [Attention Deficit Hyperactivity Disorder]. These mental health issues can influence a lack of focus and attunement to the children and impulsivity when with them.

See OCYF Exhibit 2; Psychological Evaluation Report, 3/10/15, Discussion & Recommendations, at 28-29.

On August 10, 2015, Dr. O'Hara conducted an individual evaluation of Father and an interactional evaluation of Father and Child. Dr. O'Hara noted that Father completed the Arsenal parenting program, continued to be involved with family resources in-home program, participated with the Men's Group, and the VA. See OCYF Exhibit 2; Psychological Evaluation Report, 8/10/15, Discussion & Recommendations, at 16. However, Father "acknowledged anxiety about his children, symptoms of PTSD, and poor sleep. He showed defensiveness . . . and his responses [on the test] were . . . reflective of depression, anxiety, externalization, health issues, lack of support, and distrust in relationships." See OCYF Exhibit 2; Psychological Evaluation Report, 8/10/15, Discussion & Recommendations, at 17.

On June 21, 2016, Dr. O'Hara conducted an individual evaluation of Father and an interactional evaluation of Child and Father because OCYF received reports from the foster family, the daycare, and early intervention worker that they noticed a change in Child's behavior after unsupervised, overnight visits with Father. Dr. O'Hara observed that Father "exhibited several positive parenting skills" but testified that Child "cried for several minutes during the initial part of the interactional [evaluation]. [Child] attempted to leave the evaluation. He was further

- 13 -

resistant to entering into the evaluation with his father." TR at 1; See OCYF Exhibit 2; Psychological Evaluation Report, 6/21/16, Discussion & Recommendations, at 18. Regarding Child's alleged change in behavior since beginning unsupervised, overnight visits with Father, Dr. O'Hara suggested that "increased anxiety for children of [Child's] age is not atypical during times of significant transition, especially when increased time is spent with a caregiver with whom the child is not primarily attached." However, Dr. O'Hara proffered that "given the history of allegations involving this case, in conjunction with [Mother's] allegations and [Child's] historical injuries, of which the CAC was significantly concerned, we should also be attuned to the possibility of ongoing abuse of [Child]." See OCYF Exhibit 2; Psychological Evaluation Report, 6/21/16, Discussion & Recommendations, at 18. (Emphasis added.)

On November 23, 2016, Dr. O'Hara conducted an interactional evaluation with Child with Father. Dr. O'Hara recounted that Father's parenting and mental health were still a concern and explained:

> . . . [Father] showed irritation during this evaluation in front of his son. [Father] was upset about the order of the evaluations . . . . he was of the opinion that it was unfair that the foster parents went first with [Child] not only during this evaluation but on the most recent one . . . from June.
>
> But what was concerning for me was that he showed irritation in front of [Child] and his consequent mood as a result negatively impacted his engagement, his attunement with [Child]. So he wasn't appropriately supervising [Child] during the initial part of the most recent interactional evaluation.
>
> He also appeared depressed on occasion as well, and I think this negatively impacted [Child's] engagement with his father. [Child] was distant with his father during the first 10, 15 minutes of the interactional [evaluation]. He also attempted to leave the evaluation. He was also hesitant to enter into the evaluation, and he showed qualitatively more aggression in his play than I observed during the interactional [evaluation] with his foster parents.

Given Father's "history of inattention" and "significant carelessness," Dr. O'Hara was concerned that if Father's depression and ADHD symptoms are not appropriately being addressed "his mood could negatively impact his parenting."

On November 23, 2016, Dr. O'Hara conducted a final individual evaluation of Father. Dr. O'Hara acknowledged that Father was successfully discharged from mental health treatment at the Vet Center because his doctor obtained a new position. "However, Mr. Zimmerman reports that [Father] was not discussing his OCYF involvement in treatment, nor did he disclose that [Child's] goal was changed to adoption in August. Furthermore, [Father] was not compliant with medication management and last participated in a psychiatric appointment in June." See OCYF Exhibit 2; Psychological Evaluation Report, 11/23/16, Discussion and Recommendations, at 23. Dr. O'Hara concluded:

> I'm acutely aware of [Father] being in adherence to many of the recommendations of him, and also there have been no criminal charges filed against [Father,] either. I think that he has made progress in some areas, and I think he clearly cares a lot about his son, and I think [Child] has benefits that he has in his relationship with his father as well.
>
> My main concerns, on the other hand, with regard to this case include, first of all, as I mentioned, [Father] has not reportedly been cooperative with his medications, his psychiatric appointments, and if this is valid, then his long-term issues with ADHD and depression are likely not being sufficiently addressed, and I think this can be particularly problematic when we look at some of the allegations that have happened and the injuries that have occurred with [Child] as well.
>
> [Father] does acknowledge that he's been very careless with his son, and I think this carelessness is likely to continue if the ADHD is not appropriately addressed.
>
> Secondly and foundationally, a main concern that I've alluded to is [Child] has sustained multiple substantial injuries while in his father and [Mother's] care. Also,

[Father's] daughter [I.K.-M.] sustained a black eye in the care of her father and stepmother, [Mother].

Dr. Wolford of CAC and Dr. Romberger, [Child's] pediatrician, I believe, they both believe that [Child's] substantial injuries were the result of child abuse.

Furthermore, as I've noted, [Mother] alleged significant abuse of [Child] by [Father]. Her allegations of [Child's] injuries to his head and his ear were something that was noted by . . . CAC as well. And as I mentioned, [Mother] and [S.K.] both alleged being choked by [Father].

Within the context of domestic violence, being choked is something that's not common to hear as opposed to being, you know, someone striking another. So I think that was noteworthy.

. . . [T]here's no assumption of responsibility with the exception of [Father] acknowledging that that he's been careless. There's also evidence [Father] provided contrasting accounts to Dr. Romberger with respect to [Child's] injury to his nipple, that he stated initially apparently that something had occurred in the bathroom in the waiting room prior to the visit, and after it was revealed to [Father] that that wasn't possible, the story was allegedly changed, that something had happened two weeks prior.

I don't have any evidence that [Father] has addressed the issues, the factors that are associated to the injuries of [Child], which would include emotional regulation, anger management, impulsivity, violence and low frustration tolerance.

It's my opinion that [Child] would be at risk of further injury if he were to be returned to his father's care at this time as a result of these issues not being sufficiently addressed, and so those are my foundational recommendations and opinions.

This [c]ourt concluded that Father's lack of progress in terms of parenting and mental health treatment exhibits a lack of capacity to parent Child and that he cannot or will not remedy

the conditions which led to removal in a reasonable amount of time. Additionally, termination meets the needs and welfare of Child. Accordingly, OCYF established grounds for Father's termination pursuant to [§ 2511(a)(2)]. . . .

Trial Court Opinion, 4/24/17, at 8-13 (some internal citations omitted) (internal emphasis and footnote omitted).

After a careful review of the record, we find that termination of Father's parental rights to Child was warranted pursuant to section 2511(a)(2) because the evidence demonstrates that Father lacks parental capacity and Father will be unable to remedy that situation within a reasonable period of time, if ever. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion under section 2511(a)(2). In re Adoption of S.P., 47 A.3d at 826-27.

Next, we will review Father's second issue, in which he challenges the sufficiency of the evidence to support the trial court's termination of his parental rights under section 2511(b). Father contends that the trial court abused its discretion in concluding that the evidence demonstrated a clear necessity to terminate his parental rights, as he asserts that the termination will not best serve Child's needs and welfare. Father's Brief at 10 and 14-16. Father argues that termination would unnecessarily and permanently terminate the loving relationship he has with Child, and the strong bond that Child has with him. Id. Father asserts that Mr. Kemp testified that, during his supervision of Father's visits with Child, he observed Child is animated

and excited to see Father, and Child is visibly upset when he has to separate from Father. Id. at 15 (citing N.T., 2/10/17, at 87, 90).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). See In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super 2008) (en banc). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., 620 A.2d 481, 485 (Pa. 1993), the Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013).

In addressing Father's challenge to the sufficiency of the evidence to support the termination of his parental rights under section 2511(b), the trial court stated as follows:

> Here, this [c]ourt judiciously evaluated the bond between Father and Child and determined that there was no indication that an emotional bond exists to the extent that the termination of parental rights of Father would cause Child to suffer extreme emotional consequences. In Re E.M., 620 A.2d [481,] 485 [(Pa. 1993)].

On August 8, 2016, and November 23, 2016, Dr. O'Hara conducted an interactional evaluation of the Foster Parents and Child. He "assessed [the Foster Parents] as possessing significant stability and strong parenting skills. [Child] also in my opinion demonstrated several elements or components of security and attachment in his relationship with them."

In the evaluations between Child and Father, Dr. O'Hara observed some elements of security and attachment. "There were times when he directed himself to his father. He was engaging with his father, smiled and laughed with his father as well." However, Dr. O'Hara qualified the attachment between Father and Child:

> In those cases where children are securely attached to more than one caregiver, if the child were to end the relationship with one of the caregivers, the potential detriment which could result in the end of that relationship for a child with that particular caregiver, that potential detriment can be mediated by the security and attachment that the child has with the other caregiver. And I think that would be the case for [Child], given his strong relationship with the [Foster Parents].

This [c]ourt finds it unsettling that Dr. O'Hara was in support of unsupervised visitation or at least partial unsupervised visitation prior to the evaluations in June [] 2016. However, he then recommended that all visitation be supervised due to "[Mother's] concerning allegations." While Dr. O'Hara was not able to fully discern whether Mother's allegations of domestic abuse were accurate, Dr. O'Hara testified that "there has been some consistency with regard to what [Mother] has reported and the findings from . . . [CAC]. There's also been some similarities with what [Mother] has alleged and what [was alleged by S.K.], who is [Father's] prior paramour[;] they both alleged that they had been choked by [Father]."

Child was removed from [] Father's care in November [] 2014 and has resided with the Foster Parents since September 15, 2015. Child is now three years old and has been out of [] Father's care for twenty-seven months. This [c]ourt credits Dr. O'Hara's testimony that "permanency is of urgent concern for [Child]. There's a variety of developmental needs that depend

upon factors associated with permanency and benefits of permanency, like stability and safety and security."

This [c]ourt was within its discretion when it determined that severing Child's bond with Father would not cause extreme emotional consequences. The evidence established that termination will be able to provide Child with much needed stability and permanence at his young age. This [c]ourt concludes that the developmental, physical and emotional needs and welfare of Child would be best served by terminating Father's parental rights.

. . .

With the grounds for termination established, it is evident to this [c]ourt that termination would best meet Child's needs and welfare. For the reasons set forth in this Opinion, the decision of this [c]ourt should be affirmed.

Trial Court Opinion, 4/24/17, at 14-16 (internal citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs

of the child. See In re K.Z.S., 946 A.2d 753, 763-64 (Pa. Super. 2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

In fact, our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." See In re: T.S.M., 71 A.3d at 267 quoting In re K.K.R.-S., 958 A.2d at 535. The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." In re: T.S.M., 71 A.3d at 267 quoting In re Involuntary Termination of C.W.S.M., 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting).

We have explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. In re Z.P., 994 A.2d at 1121. Further, this Court has stated: "a parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have

- 21 -

proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." In re Adoption of C.L.G., 956 A.2d at 1007 (citing In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

After a careful review of the record in this matter, we find the record supports the trial court's factual findings, and the court's conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of S.P., 47 A.3d at 826-27. Accordingly, it was proper for the trial court to find no bond exists such that Child would suffer permanent emotional harm if Father's parental rights were terminated. This Court finds no abuse of discretion in the trial court's termination of Father's parental rights pursuant to section 2511(b). We, therefore, affirm the order terminating Father's parental rights with regard to Child under section 2511(a)(2) and (b).

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/20/2017